**ODENBREIT LAW, APC**
KATHERINE J. ODENBREIT (SBN 184619)
kodenbreit@odenbreitlaw.com
16835 Algonquin Street, Suite 221
Huntington Beach, California 92649
Telephone: 888/490-3510; Facsimile: 714/908-7628

**COHELAN KHOURY & SINGER**
TIMOTHY D. COEHELAN (SBN 60827)
tcohelan@ckslaw.com
ISAM C. KHOURY (SBN 58759)
ikhoury@ckslaw.com
JEFF GERACI (SBN 151519)
jgeraci@ckslaw.com
605 C Street, Suite 200
San Diego, California
Telephone: 619/595-3001; Facsimile: 619/595-3000

**BISNAR|CHASE LLP**
BRIAN D. CHASE (SBN 164109)
bchase@bisnarchase.com
JERUSALEM F. BELIGAN (SBN 211258)
jbeligan@bisnarchase.com
1301 Dove Street, Suite 120
Newport Beach, California 92660
Telephone: 949/752-2999; Facsimile: 949/752-2777

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Cynthia L. Czuchaj, a California resident; Angelique Mundy, a Pennsylvania resident; Barbara McConnell, a Michigan resident; and Patricia Carter, a New York resident, individually and on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>       vs.<br><br>Conair Corporation, a Delaware corporation; and DOES 1 through 10, inclusive,<br><br>       Defendants. | CASE NO. 13CV01901 BEN (RBB)<br><br>**CLASS ACTION**<br><br>**POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date:    December 5, 2016<br>Time:    10:30 a.m.<br>Judge:   Hon. Roger T. Benitez<br>Place:   Courtroom 5A<br>        221 West Broadway<br>        San Diego, CA 92101 |

# **TABLE OF CONTENTS**

**PAGE**

I.      INTRODUCTION AND BACKGROUND .................................................... 1

II.     THE PARTIES AND CLASSES ................................................................ 1

III.    HISTORY OF THE LITIGATION ............................................................. 3

IV.     INVESTIGATION, DISCOVERY, AND TESTING .................................... 7

V.      MEDIATION  ........................................................................................ 10

VI.     THE SETTLEMENT AGREEMENT ....................................................... 10

VII.    NOTICE TO THE CLASS ...................................................................... 11

VIII.   THE  COURT  SHOULD  PRELIMINARILY  APPROVE  THE  CLASS
        ACTION SETTLEMENT AND SET A FINAL FAIRNESS HEARING ... 13

        A.      Strength of Plaintiff's Case and the Risk, Expense, Complexity and
                Likely Duration of Further Litigation ................................................. 15

        B.      The Extent of Discovery and Stage of the Proceedings Support the
                Settlement ......................................................................................... 17

        C.      The Settlement is the Product of Serious, Informed and Non- Collusive
                Negotiations; Class Counsel are Experienced in Similar Litigation .. 18

        D.      The Proposed Settlement is a Reasonable Compromise of Claims .... 20

IX.     CLASS  COUNSELS'  ATTORNEYS'  FEES  REQUEST  AND  CLASS
        REPRESENTATIVE SERVICE PAYMENT ............................................ 23

        A.      Motion for Award of Attorneys' Fees and Litigation Costs ............. 23

        B.      Class Representative Service Payments ............................................. 23

X.      CONCLUSION ...................................................................................... 24

i

Points & Authorities ISO Plaintiffs' Motion for an Order Granting Preliminary Approval of
Class Action Settlement - Case No. 13CV01901 BEN (RBB)

# TABLES OF AUTHORITIES

**PAGE**

## CASES

*Armstrong v. Bd. of Sch. Directors*
    616 F.2d 305 (7th Cir. 1980) .......................................................... 14

*Berry v. School Dist. of City of Benton Harbor*
    184 F.R.D. 93 (W.D. Mich. 1998) ................................................ 14

*Boyd v. Bechtel Corp.*
    485 F. Supp. 610 (N.D. Cal. 1979) ......................................... 18, 19

*Brotherton v. Cleveland*
    141 F. Supp. 2d 907 (S.D. Ohio 2001)........................................... 24

*Dunleavy v. Nadler*
    213 F.3d 454 (9th Cir. 2000) .......................................................... 13

*Ellis v. Naval Air Rework Facility*
    87 F.R.D. 15 (N.D. Cal. 1980) ...................................................... 19

*Felzen v. Andreas*
    134 F.3d 873 (7th Cir. 1998)......................................................... 14

*Fisher Bros. v. Cambridge Lee Industries, Inc.*
    630 F.Supp. 482 (E.D. Pa. 1985) ................................................. 19

*Glass v. UBS Financial Services*
    2007 U.S. Dist. LEXIS 8476 (N.D. Cal. Jan. 26, 2007) ............... 24

*Hanlon v. Chrysler Corp.*
    150 F.3d 1011 (9th Cir. 1988)....................................................... 14

*In re Mego Fin. Corp. Sec. Litig.*
    213 F. 3d 454 (9th Cir. 2000)........................................................ 22

*In re Mid-Atlantic Toyota Antitrust Litig.*
    564 F. Supp. 1379 (D. Md. 1983) ................................................. 14

ii

Points & Authorities ISO Plaintiffs' Motion for an Order Granting Preliminary Approval of Class
Action Settlement - Case No. 13CV01901 BEN (RBB)

*In re Omnivision Technologies, Inc.*
        559 F. Supp. 2d 1036 (N.D. Cal. 2007) ........................................................ 19

*Koch v. Greenberg*
        14 F. Supp. 3d 247 (D.N.Y. 2014) ............................................................... 3

*Linney v. Cellular Alaska Partnership*
        151 F.3d 1234 (9th Cir. 1998) ............................................................. 13, 22

*Officers for Justice v. Civil Serv. Comm'n*
        688 F.2d 615 (9th Cir. 1982) ...................................................................... 22

*Singer v. Becton Dickinson & Co.*
        2010 U.S. Dist. LEXIS 53416 (S.D. Cal. June 1, 2010) .............................. 23

*Staton v. Boeing Corp.*
        327 F.3d 938 (9th Cir. 2003) ...................................................................... 23

*Stovall-Gusman v. Granger, Inc.*
        2015 WL 3776765N.D. Cal. June 17, 2015) ................................................ 22

*Torrisi v. Tucson Elec. Power Co.*
        8 F.3d 1370 (9th Cir. 1993) ........................................................................ 14

*Van Vranken v. Atlantic Richfield Co.*
        901 F. Supp. 294 (N.D. Cal. 1995) ............................................................. 24

## <u>STATUTES AND REGULATIONS</u>

<u>PAGE</u>

<u>*California Business and Professions Code*</u>
        § 17200, et seq ............................................................................................... 3

<u>*California Civil Code*</u>
        § 1750, *et seq* ............................................................................................... 3
        § 1791, *et seq* ............................................................................................... 3

<u>*California Code of Civil Procedure*</u>
        § 1792, *et seq* ............................................................................................... 3

_United States Code_
    15 U.S.C. § 2301 ............................................................................ 3

## **MISCELLANEOUS AUTHORITIES**

4 Herbert Newberg & Alba Conte, _Newberg on Class Actions,_ vol. 4 (4th ed. 2002)
    § 11.22, et seq. ............................................................. 13
    § 11.25 ................................................................ 13, 14

iv

Points & Authorities ISO Plaintiffs' Motion for an Order Granting Preliminary Approval of Class
Action Settlement - Case No. 13CV01901 BEN (RBB)

## I.    INTRODUCTION AND BACKGROUND

Plaintiffs Cynthia Czuchaj and Patricia Carter seek preliminary approval of the settlement of this certified class action alleging Conair Corporation's model 259 or 279 Infiniti Pro 1875 watt hair dryer ("Hair Dryer" or "Dryer") was defectively designed. Declaration of Isam C. Khoury ("Khoury Decl.") ¶8.

Plaintiffs alleged the Hair Dryers had two design defects: The Dryers manufactured by Neumax and Silver Plan had a "coil defect" which could cause the Dryers to shoot sparks, flames, and heater coils from the barrel; and, the Dryers made by Sun Luen until August 2013, had a "cord defect" which could cause sparks and flames where the line cord connects to the handle. Khoury Decl. ¶9.

The initial complaint alleged a number of claims on behalf of a nationwide, and several statewide classes. After protracted discovery, motion practice, and multiple court orders, two subclasses were certified: (1) A New York subclass represented by Carter on behalf of consumers who purchased a Hair Dryer in New York from August 15, 2010 to the present, and, (2) A California subclass represented by Czuchaj on behalf of consumers who purchased a Hair Dryer in California from August 15, 2009 to the present. Khoury Decl. ¶10.

Conair denies all claims and maintains it has not sold defectively designed products, and has complied with all laws, including those of California and New York, in the sale of those products. Khoury Decl. ¶11.

## II.   THE PARTIES AND CLASSES

Defendant Conair is an international consumer and professional products company. It has been selling personal grooming products, including hair dryers, for over fifty years. Conair approved the design of, and arranged for several Chinese companies to manufacture the Hair Dryers, including Neumax, Sun Luen, and Silver Plan. Khoury Decl. ¶12.

Plaintiff and Class Representative Cynthia Czuchaj purchased a hair dryer in October 2011 from California Sam's Club (Sun Luen). In August 2012, Czuchaj was

drying her hair when flames began to come from the hair dryer where the cord enters the body of dryer. She had to drop the dryer and it burned her carpet. Khoury Decl. ¶13.

Plaintiff and Class Representative Patricia Carter purchased a hair dryer in New York in 2013 from Ulta Beauty (Neumax). In November 2013, Carter's dryer ejected hot coils, which lodged in and burned her scalp. Khoury Decl. ¶14.

Plaintiff Angelique Mundy purchased a hair dryer in 2012 from a Pennsylvania Wal-Mart (Neumax). In August 2013, Mundy was drying her hair when several hot coils were projected from the barrel of the hair dryer, burning her chest and causing bodily injury. Khoury Decl. ¶15.

Plaintiff Barbara McConnell purchased a hair dryer in March 2012 from Target in Ohio. In October 2013, McConnell was drying her hair when flames came from the cord, forcing her to throw the dryer down on a bathroom sink.[1] Khoury Decl. ¶16.

Czuchaj represents a California Class defined as:

"Any consumer who purchased in the state of California a Conair Corporation model 259 or 279 Infiniti Pro 1875 watt hair dryer manufactured by Sun Luen, Silver Plan, or Neumax, any time between August 15, 2009 and the present, sold by Conair directly or through a retailer for primarily personal, family, or household purposes, and not for resale." Khoury Decl. ¶18.

Carter represents a New York Class defined as:

"Any consumer who purchased in the state of New York a Conair Corporation model 259 or 279 Infiniti Pro 1875 watt hair dryer, manufactured by Sun Luen, Silver Plan, or Neumax, any time between August 15, 2010 and the present, sold by Conair directly or through a retailer for primarily personal, family or household

---

[1]McConnell and Mundy briefly represented a nationwide class. When the Court decertified that class, they were no longer class representatives. Their individual claims have been resolved. Khoury Decl. ¶17.

purposes, and not for resale." Khoury Decl. ¶19.

The Court determined the California Class could only assert a claim under the Song-Beverly Act. (Civ. Code §§ 1791, *et seq*), and the New York Class could only assert a claim under New York's General Business Law, which requires proof, not only that the Hair Dryers were defectively designed, but also, "(1) 'the defendant has engaged in an act or practice that is deceptive or misleading in a material way'; (2) the 'plaintiff has been injured by reason thereof'; and (3) the deceptive act or practice is 'consumer oriented.'" *Koch v. Greenberg*, 14 F. Supp. 3d 247, 261 (D.N.Y. 2014). The Court further limited the New York subclass to class members who could have purchased Hair Dryers with a "coil defect." Khoury Decl. ¶20.

## III.   HISTORY OF THE LITIGATION

On April 15, 2013, Plaintiffs served Conair with a pre-filing Notice of Violations of the Consumer Legal Remedies Act ("CLRA"), a prerequisite to a claim for damages under the CLRA. [Docket No. 1]

On August 15, 2013, Plaintiff Cynthia Czuchaj filed a putative class action in the United States District Court for the Southern District of California entitled, *Cynthia L. Czuchaj, et al. v. Conair Corporation, et al.*, United States District Court, Case No.: 13-cv-1901 BEN (RBB) (the "Action"), alleging she suffered property damage and bringing claims on behalf of a United States class and/or California class who purchased, not for resale, a Conair Infiniti Pro 1875 watt model 259 hair dryer. The Complaint sought certification of a nationwide Class and/or California class based on the following causes of action: (1) California Business & Professions Code §17200, *et seq.* ("UCL"); (2) California Civil Code §1750, *et seq.* ("CLRA"); (3) Strict Products Liability-Defective Design or Manufacture; (4) Strict Products Liability-Failure to Warn; (5) Breach of Implied Warranty; (6) Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.* ("MMWA"); and (7) Song-Beverly Warranty Act, California Code of Civil Procedure §1792, *et. seq.* ("Song-Beverly"). [Docket No. 1].

On December 17, 2013, Plaintiffs Cynthia Czuchaj, Angelique Mundy, Barbara McConnell, and Patricia Carter, filed an Amended Complaint. [Docket No. 9.] Plaintiffs sought to represent all consumers in the United States who purchased, not for resale, the Hair Dryer. Plaintiffs sought nationwide certification of claims based upon: (1) UCL; (2) CLRA; (3) Strict Products Liability-Defective Design or Manufacture; (4) Strict Products Liability-Failure to Warn; (5) Breach of Implied Warranty; and (6) MMWA. In addition, Plaintiff Cynthia Czuchaj sought to represent a California subclass of purchasers of the Hair Dryer for claims based upon: (1) UCL; (2) CLRA; (3) Strict Products Liability-Defective Design or Manufacture; (4) Strict Products Liability-Failure to Warn; (5) Breach of Implied Warranty; and (6) Song-Beverly. Plaintiff Angelique Mundy sought to represent a Pennsylvania subclass of purchasers of the Hair Dryer for claims based upon: (1) Strict Products Liability-Defective Design or Manufacture; (2) Strict Products Liability-Failure to Warn; (3) Breach of Implied Warranty; and (4) Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1 thru 201-9.2 ("UTPCPL"). Plaintiff Barbara McConnell sought to represent Michigan and Ohio subclasses of purchasers of the Hair Dryer for claims based upon: (a) for the Michigan subclass: (1) Strict Products Liability-Defective Design or Manufacture; (2) Strict Products Liability-Failure to Warn; (3) Breach of Implied Warranty; (4) MCL 600.2945 (Strict Products Liability statute); and (5) Michigan Consumer Protection Act; and (b) for the Ohio subclass: (1) Strict Products Liability-Defective Design or Manufacture; (2) Strict Products Liability-Failure to Warn; (3) Breach of Implied Warranty; (4) Breach of Ohio Implied Warrant in Tort; (5) Ohio Product Liability Act, R.C. §2307.71-2307.80; and (6) Statutory Inadequate Warning, O.R.C. §2307.76. Plaintiff Patricia Carter sought to represent a New York subclass of purchasers of the Hair Dryer for claims based upon: (1) Strict Products Liability-Defective Design or Manufacture; (2) Strict Products Liability-Failure to Warn; (3) Breach of Implied Warranty; and (4) New York General Business Law §349.

Conair filed three Rule 12 Motions in response to the FAC. [Docket Nos. 12-14] Plaintiffs opposed and the Court ruled on each in separate orders. [Docket Nos. 29-31.]

On June 2, 2014, Plaintiffs filed a Second Amended Complaint ("SAC"). [Docket No. 41] Plaintiffs sought to represent a Nationwide Class and California subclass of purchasers of the Hair Dryer for claims based upon: (1) CLRA; (2) UCL; (3) Song-Beverly; (4) Breach of Implied Warranty; (5) Strict Products Liability-Defective Design or Manufacture; (6) Strict Products Liability-Failure to Warn; and (7) MMWA. Plaintiff Angelique Mundy sought to represent a Pennsylvania subclass of purchasers of the Hair Dryer for claims based upon: (1) UTPCPL; (2) Breach of Implied Warranty; (3) Strict Products Liability-Defective Design or Manufacture; (4) Strict Products Liability-Failure to Warn; and (5) MMWA.  Plaintiff Barbara McConnell sought to represent Michigan and Ohio subclasses of purchasers of the Hair Dryer for claims based upon: (a) for the Michigan subclass: (1) Michigan Consumer Protection Act, MCL 445.902, *et. seq.*; (2) MCL 600.2945, *et seq.* (Strict Products Liability statute); (3) Breach of Implied Warranty; (4) Strict Products Liability-Defective Design or Manufacture; (5) Strict Products Liability-Failure to Warn; and (6) MMWA; and (b) for the Ohio subclass: (1) Breach of Ohio Implied Warrant in Tort; (2) Ohio Product Liability Act, R.C. §2307.71-2307.80; (3) Statutory Inadequate Warning, O.R.C. §2307.76; (4) Breach of Implied Warranty; (5) Strict Products Liability-Defective Design or Manufacture; (6) Strict Products Liability-Failure to Warn; and (7) MMWA. Plaintiff Patricia Carter sought to represent a New York subclass of purchasers of the Hair Dryer for claims based upon: (1) GBL; (2) Breach of Implied Warranty; (3) Strict Products Liability-Defective Design or Manufacture; (4) Strict Products Liability-Failure to Warn; and (5) MMWA.

On September 21, 2015, Plaintiffs filed a motion for class certification. [Docket No. 108.]

On November 12, 2015, the Court issued an order granting in part and denying in part Plaintiffs' Motion to Certify the Class. The Court certified a nationwide class for Plaintiffs' claim for breach of common law implied warranty of merchantability. The Court also certified a California subclass for violation of the UCL, CLRA, and Song-Beverly. The Court also certified a New York subclass for violation of the GBL. The Court denied the remainder of Plaintiffs' motion for class certification. [Docket No. 170.]

On January 25, 2016, Conair moved to decertify the nationwide class for Plaintiffs' implied warranty of merchantability claims. [Docket No. 191.]

On March 30, 2016, the Court granted in part and denied in part Conair's motion for decertification of the nationwide class for Plaintiffs' breach of implied warranty claim. The Court granted the motion to decertify the nationwide class under FRCP 23(b)(3), but denied the motion to decertify the nationwide class under FRCP 23(b)(2). [Docket No. 248.]

On January 25, 2016, Conair also moved for summary judgment as to Plaintiff Czuchaj's UCL, CLRA, and Song-Beverly claims and Plaintiff Carter's GBL claim. [Docket No. 185.]

On April 5, 2016, the Court granted in part Conair's motion for summary judgment. The Court granted Conair's motion with respect to Czuchaj's UCL and CLRA claims, but not with respect to Czuchaj's Song-Beverly claim and Carter's GBL claim. [Docket No. 251.]

On April 18, 2016, Plaintiffs filed a Motion for Approval of Notice of Class Certification. [Docket No. 256.]

On May 13, 2016, the Court granted Plaintiffs' Motion for Approval of Class Notice. [Docket No. 274.] Subsequently, Plaintiffs caused notice to be delivered to the California and New York subclasses as ordered by the Court.

On May 24, 2016, the Court issued an order decertifying the FRCP 23(b)(2) nationwide class for injunctive relief. [Docket No. 280.] The Court set the trial to

begin on September 13, 2016.

On June 20, 2016, Conair filed a motion to sever and transfer certain claims. [Docket No. 290.]

On July 1, 2016, Conair filed a motion to modify the New York and California subclass definitions. [Docket No. 298.]

On August 10, 2016, following a status conference on August 9, 2016, the Court reset the trial for September 8, 2016. [Docket No. 335.]

On August 10, 2016, the Court granted in part Conair's motion to sever and transfer certain individual claims. The Court severed the individual claims of Plaintiffs Carter, McConnell and Mundy. Carter's claims were transferred to the United States District Court for the Western District of New York. McConnell's claims were transferred to the United States District Court for the Eastern District of Michigan. Mundy's claims were transferred to the United States District Court for the Middle District of Pennsylvania. [Docket No. 336.]

On August 15, 2016, the Court granted in part Conair's motion to modify the subclass definitions. [Docket No. 337.] The New York subclass was modified as follows:

> "Any consumer who purchased in the state of New York a Conair Corporation model 259 or 279 Infiniti Pro 1875 watt hair dryer, manufactured by Sun Luen, Silver Plan, or Neumax, any time between August 15, 2010 and the present, sold by Conair directly or through a retailer for primarily personal, family or household purposes, and not for resale."

The California subclass definition was modified as follows:

> "Any consumer who purchased in the state of California a Conair Corporation model 259 or 279 Infiniti Pro 1875 watt hair dryer manufactured by Sun Luen, Silver Plan, or Neumax, any time between August 15, 2009 and the present, sold by Conair directly or through a retailer for primarily personal, family, or household purposes, and not for resale."

## IV.   INVESTIGATION, DISCOVERY, AND TESTING

Plaintiffs' Counsel diligently investigated the Class claims against Defendant,

the law applicable to the nationwide and state claims, and all applicable defenses. Plaintiffs retained consultants and experts to examine the Hair Dryers, analyze the testing conducted by Conair and its internal and retained experts, and conduct independent testing, including destructive testing. Plaintiffs also retained consultants and experts to analyze the potential damages to the Class and review Defendant's analysis of Class damages. Khoury Decl. ¶21.

Before filing the lawsuit, Plaintiffs' Counsel examined the Hair Dryer which injured Czuchaj, and other similar Dryers, investigated Conair's marketing and sale of those Dryers, and complaints by other consumers, including those found on websites like consumeraffairs.com. Counsel also reviewed and analyzed complaints about the Hair Dryers filed with the United States Consumer Product Safety Commission ("CPSC"). Khoury Decl. ¶22.

Plaintiffs made four disclosures of witnesses and documents pursuant to FRCP 26(a), starting before discovery commenced. Plaintiffs reviewed several disclosures by Defendant. Khoury Decl. ¶23.

Between the Parties, over thirty-five sets of formal written discovery were propounded and responded to, as well the production and exchange of over 33,000 pages of relevant documents. Khoury Decl. ¶24.

The Parties met and conferred extensively regarding discovery responses and document productions and brought, and defended against, several motions to compel further responses to discovery. Khoury Decl. ¶25.

In additional to the extensive written discovery and document exchange, many depositions were taken, in California and Connecticut, requiring Counsel and three of the Plaintiffs to travel cross-country. Defendant deposed Plaintiffs Cynthia Czuchaj, Angelique Mundy, Barbara McConnell, and Patricia Carter, and Class Member Lacey Ellington. Defendant also deposed Plaintiffs' designated liability expert, engineer Phil Van Herle, and Plaintiffs' designated damages expert, economist Mark Falkenhagen. Khoury Decl. ¶26.

1    Counsel for Plaintiffs deposed, pursuant to FRCP 30(b)(6), Vito Carlucci,
2  Director of Engineering; and, Paulette Heller, Vice President of Marketing. Plaintiffs
3  also deposed Defendant's designated liability expert, engineer Robert Carnahan, and
4  designated expert to critique Plaintiffs' damage calculations, marketing expert,
5  Dominique M. Hannssens. Khoury Decl. ¶27.

6    Plaintiffs served twenty-one Subpoenas to Produce Documents on third-party
7  retailers to gather information about the number of Hair Dryers sold to consumers,
8  the method of tracking consumers who purchased the Hair Dryers, and contact
9  information of those consumers. Plaintiffs received responses from multiple
10  vendors, including Bed Bath & Beyond, Target, and Harmon Stores, Inc. Khoury
11  Decl. ¶28.

12    Counsel for the Parties performed an extensive investigation into the claims at
13  issue, including rigorous testing regarding the alleged defects in the Hair Dryers.
14  Plaintiffs retained expert engineer Phil Van Herle and his firm, 4x Forensics. Mr.
15  Van Herle and his firm analyzed the product specifications of the Hair Dryers
16  manufactured by the three Chinese manufacturers at issue, Neumax, Sun Luen, and
17  Silver Plan; the testing performed by Conair of Neumax dryers, and Conair
18  documents regarding the redesign of the Sun Luen dryers. Mr. Van Herle and his
19  firm tested ten Hair Dryers, including those of Plaintiffs Carter and Czuchaj, Class
20  Members, and exemplar dryers obtained specifically for testing. Hair Dryers were
21  disassembled, photographed, and their component materials analyzed using several
22  techniques, including a Scanning Electron Microscope and Energy-Dispersive X-ray
23  Spectroscopy. Khoury Decl. ¶29. The cord and "strain relief" of the Hair Dryers was
24  destructively tested to determine the materials used in their construction and the
25  nature, quality, and performance of those materials. Conair's experts conducted
26  similar testing and experts for both Parties were able to observe all testing, and both
27  experts produced detailed reports. *Id*.

28    The Parties conducted thorough discovery and exchanged a large quantity of

1  documents, many of which were highly technical and related to the design,

2  manufacture, and testing of the Hair Dryers at issue; conducted extensive analysis

3  and testing of the Hair Dryers in a mutually agreed and fully disclosed manner; and

4  engaged in lengthy and extensive motion practice resulting in many dispositive

5  rulings. All or which allowed Plaintiffs' Counsel to make a complete assessment of

6  the strengths and weaknesses of the claims against Defendant and the benefits of the

7  proposed Settlement. Khoury Decl. ¶30.

8  **V.    MEDIATION**

9     On August 23, 2016, the Parties engaged in confidential, extensive, arm's-

10  length negotiation and mediation with the Hon. Leo Papas (Ret.) ("Mediator").

11  Judge Papas is a retired Magistrate Judge of the United States District Court for the

12  Southern District of California and an experienced and highly regarded mediator.

13  During this mediation, the Parties reached a settlement which was reduced to a

14  written memorandum of understanding (MOU). The MOU was superseded by a

15  written Settlement Agreement executed by all Parties. The proposed Settlement is

16  memorialized in the Class Action Settlement Agreement ("Agreement"), presented

17  here for preliminary approval. Khoury Decl. ¶31, Exhibit 1.

18     The mediation was attended by Defendant's Counsel Ryan Saba and Momo

19  Takahashi. Plaintiffs' were represented by Class Counsel Isam Khoury, Jeff Geraci,

20  Katherine Odenbreit, Brian Chase, and Jerusalem Beligan. All Plaintiffs, and a

21  representative of Conair, were available by phone during the mediation. Khoury

22  Decl. ¶32.

23  **VI.   THE SETTLEMENT AGREEMENT**

24     Pursuant to the Agreement, and subject to and contingent upon Court

25  approval, the Parties have agreed this action will be settled and compromised on the

26  terms set forth in the Settlement Agreement, which include the following:

27     Purchasers of Hair Dryers made by Neumax submitting a qualifying claim by

28  returning their Neumax dryer to Conair will receive a new hair dryer. The total

- 10 -

consideration made available to Class Members in this component of the Settlement is between $2.67 and $3.42 million. Khoury Decl. ¶33.

Purchasers of Dryers made by Sun Luen or Silver Plan submitting a qualifying claim will receive $5 in cash without the need to return their Hair Dryers. The total potential value of this Class Settlement consideration is between $1.91 and $1.95 million, making the total value to the class $4.58 to $5.37 million. Khoury Decl. ¶34.

Conair will pay $253,977.64, the cost of Kurtzman Carson Consultants LLC ("KCC") having provided the notice of Class Certification ordered by the Court. Khoury Decl. ¶35.

The Settlement Agreement requires Conair to pay all administrative costs necessary to give notice of, and administer the distribution of, the Settlement. Khoury Decl. ¶36.

Conair will pay Class Representative service payments to Plaintiffs Cynthia Czuchaj and Patricia Carter in the sum of $10,000 each, in consideration of their initiation and prosecution of this Action, service as representatives of the Class, and undertaking the risk of the payment of costs in the event the case did not conclude successfully. Khoury Decl. ¶37.

Conair will reimburse Plaintiffs' counsel for out of pocket costs incurred and paid in prosecuting this Action, in an amount up to $231,000. Khoury Decl. ¶38.

Conair will pay attorneys' fees of up to $1,196,000 to compensate Class Counsel for work already performed and all work remaining to be performed in documenting, securing Court approval of, and administering the settlement. Khoury Decl. ¶39.  This is an amount less than 25% of the low end of the value made available to the class under the Settlement. *Id*.

## VII.   NOTICE TO THE CLASS

Following preliminary approval of the Settlement, KCC, the Settlement Administrator selected by Plaintiffs, agreed to by Defendant, and previously approved by the Court, will email the long-form Notice of the Class Settlement to

each Class Member for whom KCC has email addresses, and send it via US first-class mail to all Class Members for whom it has physical addresses, using its standard and customary methods of ensuring correct, updated addresses are obtained and Notices are distributed. Khoury Decl. ¶40; Exhibits 1- A, B, C.

Class Settlement Administrator KCC will also set-up and maintain www.conairclassactionsettlement.com, which shall host the Court-approved long-form Class Notice, Claim Form, and other pertinent information concerning the Settlement provide documents related to the Class Action and the Settlement, and answer frequently asked questions. KCC will also set-up and maintain a toll-free telephone number with additional information and answers to frequently asked questions. Khoury Decl. ¶41.

The Notice of Settlement will also be published in the same manner as the Notice of Class Certification. Administrator KCC will create the above-described Settlement website which shall host the Court-approved long-form Class Notice, Claim Form, and other pertinent information concerning the Settlement. Khoury Decl. ¶42.

Class Settlement Administrator KCC will ensure the Notice program includes the following:

A.   A one-time publication of a full page short-form Notice in the California and/or New York regional publication of People Magazine in the New York and California state editions.

B.   A one-time publication of a 2/5 page short-form Notice in the California and/or New York regional publication of Parade Magazine in the New York and California state editions.

C.   A one-time publication of a 1/4 page short-form Notice in the California and/or New York regional publication of the New York Times (daily edition) positioned within the main news.

D.   A one-time publication of a 1/4 page short-form Notice in the

California and/or New York regional publication of the Wall Street Journal positioned within the Legal Notice Section.

      E.    Internet banners with a short statement directing individuals to the Settlement website, of 15 million impressions for a four week period targeting women over the age of 18 in California and New York. Khoury Decl. ¶43.

      The Notice explains to the Class (1) their right to participate in the Settlement, (2) how to make a claim, (3) that a current address must be provided to Settlement Administrator to receive their settlement consideration, (4) how to object to the settlement, (5) how to opt out of the settlement, (6) the procedures and timing for doing each of these acts, (7) the effect of doing or not doing each of these acts, (8) the date, time, and place of the Final Fairness Hearing, and, (9) how to obtain further information about the Settlement through the Settlement website and toll-free phone number. Khoury Decl. ¶44.

## VIII. THE COURT SHOULD PRELIMINARILY APPROVE THE CLASS ACTION SETTLEMENT AND SET A FINAL FAIRNESS HEARING

      Class action settlements are subject to court review and approval under the Federal Rules of Civil Procedure. A class action may not be dismissed, compromised, or settled without the approval of the Court. FRCP Rule 23(e). The decision to approve or reject a proposed settlement is committed to the Court's sound discretion. *Dunleavy v. Nadler*, 213 F.3d 454, 458 (9th Cir.2000), citing *Linney v. Cellular Alaska Partnership,* 151 F.3d 1234, 1238 (9th Cir. 1998).

      This procedure safeguards Class Members' due process rights and enables the Court to fulfill its role as the guardian of class interests.  *See* Alba Conte & Herbert Newberg, *4 Newberg on Class Actions* (2002) ("*Newberg*"), §§ 11.22, *et seq*.  The purpose of the Court's preliminary evaluation of the proposed Settlement is to determine whether it is within the "range of reasonableness," and whether notice to the Class and a formal fairness hearing are appropriate. *See Newberg* § 11.25.

      At this stage, the Court is not making a final determination on whether the

1  settlement is fair, reasonable, and adequate, as is ultimately required by FRCP Rule
2  23(e). Rather, the Court need only decide whether the settlement "appears to fall
3  within the range of possible approval." *Armstrong v. Bd. of Sch. Directors*, 616 F.2d
4  305, 314 (7th Cir. 1980), overruled on other grounds by *Felzen v. Andreas*, 134 F.3d
5  873 (7th Cir. 1998); *see also Berry v. School Dist. of City of Benton Harbor*, 184
6  F.R.D. 93, 97 (W.D. Mich. 1998) (the court first must determine "whether the
7  proposed settlement is potentially approvable"); *In re Mid-Atlantic Toyota Antitrust*
8  *Litig.*, 564 F. Supp. 1379, 1384 (D. Md. 1983) (likening preliminary approval to a
9  finding there is "probable cause" to submit the settlement to the class and to hold a
10  full-scale final approval hearing); *Newberg* § 11.25.

11      Courts must give "proper deference" to settlement agreements, because "the
12  court's intrusion upon what is otherwise a private consensual agreement negotiated
13  between the parties to a lawsuit must be limited to the extent necessary to reach a
14  reasoned judgment that the agreement is not the product of fraud or overreaching by,
15  or collusion between the negotiating parties, and the settlement, taken as a whole, is
16  fair, reasonable and adequate to all concerned." *Hanlon v. Chrysler Corp.*, 150 F.3d
17  1011, 1027 (9th Cir. 1988) (citations omitted.)

18      The Court's determination of whether a proposed settlement is fair, adequate,
19  and reasonable is often said to require a balancing of several factors. These factors
20  may include, among others: "the strength of plaintiff's case; the risk, expense,
21  complexity, and the likely duration of further litigation; the risk of maintaining class
22  action status throughout the trial; the amount offered in settlement; the extent of
23  discovery completed, and the stage of the proceedings; the experience and views of
24  counsel; the presence of a governmental participant; and the reaction of the class
25  members to the proposed settlement. This list is not exclusive and different factors
26  may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8
27  F.3d 1370, 13785 (9th Cir. 1993) (citation and internal quotations omitted.)

28      A discussion of these factors support the conclusion the proposed Settlement

- 14 -

1  is "fair, adequate and reasonable."

2      A.      **Strength of Plaintiff's Case and the Risk, Expense, Complexity and Likely Duration of Further Litigation.**

3

4      While Plaintiffs believe in the merits of their case, they recognize the inherent

5  risks and uncertainty of litigation, including that the Class could recover nothing,

6  and understand the benefit of making a significant Settlement available to the class

7  now. The specific risks include: unfavorable rulings on renewed motions to

8  decertify, sever, or transfer the subclasses; unfavorable rulings on anticipated

9  motions in limine, not yet decided at the time of mediation, including those to limit

10  or exclude evidence necessary to establish liability and damages; the need for a

11  unanimous jury; the risk the jury would not find the Hair Dryers were defectively

12  designed, the only way to support class-wide relief, as defective manufacture could

13  not apply class wide; the risk that even if the Hair Dryers were found defective,

14  Conair would not be found liable on either of the only two remaining claims to be

15  tried; the risk that even if liability were found, the jury could award no, or very

16  limited damages based on evidence of a low percentage of Dryer failures; even if

17  successful, the risk of post-trial motions setting aside liability findings, or reducing

18  damages; even if a judgment were obtained, the risk of the delay and uncertainty of

19  appeals, including of remand or outright reversal. Khoury Decl. ¶45.

20      Plaintiffs asserted Conair's Hair Dryers had two different design defects: the

21  "coil defect" and the "cord defect." Conair presented significant factual and legal

22  challenges to both. Khoury Decl. ¶46.

23      Conair contended, among other things, the "coil defect" was limited to one

24  particular Chinese factory, owned by Neumax, which went out of business in March

25  2013.  Conair presented evidence it evaluated the twenty or so complaints it received

26  about the Hair Dryers, tested them, determined there may have been a manufacturing

27  defect, with the potential to affect a very limited amount of Dryers containing

28  specific components, made at a specific factory, during a specific time, and which

- 15 -

had actually effected only a very small of percentage of even those Dryers. Conair then initiated a voluntary recall of the Neumax Dryers. Khoury Decl. ¶47.

There is a significant risk a jury could agree with Conair's position and find there was no design defect in the Neumax or Silver Plan Dryers, there were so few complaints about the Dryers any defect was unlikely, and that to the extent there was a potential manufacturing defect, the recall of those Dryers was an appropriate response. Khoury Decl. ¶48.

Conair contended, among other things, there was no "cord defect" in its Sun Luen Dryers. It introduced evidence the same cord design was already used in Dryers manufactured by Neumax and Silver Plan, the design and materials had been approved by the independent Underwriters Laboratory, and was merely accepted by Conair. Conair also introduced evidence of an extremely low percentage of complaints of "cord defects" compared to the total number of Sun Luen Dryers sold. Khoury Decl. ¶49. Conair also addressed any potential issues, and eliminated the potential for any design defect in July 2013, when it changed the design of the Sun Luen cord. Although Plaintiffs argued this change indicated there was a problem with the cord, Conair pointed out it did not redesign the cord, but only made it consistent with all other Dryers it sold. Khoury Decl. ¶50.

There is a significant risk a jury could agree with Conair's position and find there was no design defect in the Sun Luen Dryers, there were so few complaints about the Dryers any defect was unlikely, and that to the extent there was a potential defect, the change in design was an appropriate response, and not an indication of a defect. Khoury Decl. ¶51. Conair also argued, based on less than .03% of purchasers making complaints of any kind to Conair, or any agency, that whatever incidents occurred with the Hair Dryers could not be shown to be a defect, and certainly not a design defect effecting all Dryers. Khoury Decl. ¶52.

As to both defects, Conair contended Plaintiffs could not adequately establish damages. This contention was based on, among other things, the challenge in

determining precisely how many Hair Dryers were purchased in the only two states remaining in the action, California and New York. Conair presented expert opinion by Dominque Hanssens that only .03% of the Class had suffered injury, based on less than .03% of purchasers making complaints of any kind to Conair, or any agency. Conair's economist relied on this to calculate damages to the Class at $0 to $2,767.00. Each of Conair's arguments was supported by testimony of a qualified and experienced expert. Khoury Decl. ¶53.

Plaintiffs' claims involve complex and disputed legal issues and fact-specific arguments which the Parties litigated fiercely since the action began.  Conair has strong defenses to liability, damages, and even to continued maintenance of class certification. Conair successfully persuaded the Court to decertify or summarily adjudicate large portions of Plaintiffs' claims and intended to continue to seek to eliminate or further reduce those claims before, during, and after trial, and on appeal after judgment was entered. Conair was also prepared to marshal significant and potentially dispositive evidence and arguments at trial, showing the Hair Dryers did not have design defects, which were presented to the Court, in part, in motions, and oppositions, to exclude the testimony of the Parties' liability experts. Khoury Decl. ¶54.

**B.**   **The Extent of Discovery and Stage of the Proceedings Support the Settlement.**

The proposed Settlement is the product of substantial effort by the Parties as reflected in Section IV, above. Plaintiffs' investigation of the facts and claims was substantial and significant. The Parties exchanged a tremendous amount of data, including written discovery and tens of thousands of pages of detailed records. Plaintiffs interviewed Class Members and deposed Defendant's key personnel and retained experts. Khoury Decl. ¶¶21-30, 55.

As described above, Plaintiffs retained experts to analyze Dryers for design defects, including by conducting destructive testing and analysis of the components

1    and materials used in the Dryers. Khoury Decl. ¶56.

2         The Parties have thoroughly investigated and evaluated the factual strengths

3    and weaknesses of this case and engaged in extensive investigation and discovery

4    reflected above to support the Settlement. Khoury Decl. ¶57. The Settlement before

5    this Court came only after the case was fully investigated by Counsel. This litigation

6    has reached a stage where the Parties have a clear view of the strengths and

7    weaknesses of their cases sufficient to support a Settlement. *Boyd v. Bechtel Corp*.,

8    485 F. Supp. 610, 622 (N.D. Cal. 1979).

9    **C.    The Settlement is the Product of Serious, Informed and Non-**
10        **Collusive Negotiations; Class Counsel are Experienced in Similar**
         **Litigation.**
11

12        "In the Ninth Circuit, a Court affords a presumption of fairness to a

13   settlement, if: '(1) the negotiations occurred at arm's length; (2) there was sufficient

14   discovery to allow counsel to act and the Court to review their actions in an

15   informed manner; (3) the proponents of the settlement are experienced in similar

16   litigation; and (4) only a small fraction of the class objected.'" *Rodriguez v. West*

17   *Publishing Corp*., No. CV-05-3222 R(MCx) 2007 U.S. Dist. LEXIS 74849 at 33

18   (C.D. Ca. Sept. 10, 2007). Three out of the four factors are clearly met, and the

19   fourth must be evaluated after preliminary approval and notice to the Class.

20        The proposed Settlement was reached through a fair compromise of disputed

21   claims arrived at through substantial exchange of information, exhaustive analysis,

22   extensive motion practice which redefined and reduced the scope of the claims,

23   followed by a full day of arm's-length negotiations before a respected mediator with

24   expertise in the management and resolution of similar cases.

25        Class Counsel Bisnar Chase is recognized as a leading law firm in the

26   investigation, litigation, and trial of product defect claims. See Declaration of Brian

27   D. Chase. Class Counsel Cohelan, Khoury & Singer has substantial experience and

28   significant success serving as class counsel for classes of consumers and employees.

1   See Khoury Decl. Class Counsel Katherine Odenbreit Law has significant
2   experience in litigating class actions. See Declaration of Katherine J. Odenbreit.

3    Defendant's counsel, Ryan Saba and Momo Takahashi of Rosen Saba are also
4   particularly experienced in class action litigation. Khoury Decl. ¶69.

5    Experienced counsel, operating at arm's-length, have weighed the strengths of
6   the case and examined all of the issues and risks of litigation and endorse the
7   proposed Settlement. The view of the attorneys actively conducting the litigation "is
8   entitled to significant weight" in deciding whether to approve the settlement.
9   (*Fisher Bros. v. Cambridge Lee Industries, Inc.* (E.D. Pa. 1985) 630 F.Supp. 482,
10   488; *Ellis v. Naval Air Rework Facility* (N.D. Cal. 1980) 87 F.R.D. 15, 18, *aff'd*. 661
11   F.2d 939 (9th Cir. 1981). "The recommendations of plaintiffs' counsel should be
12   given a presumption of reasonableness" *In re Omnivision Technologies, Inc*., (N.D.
13   Cal. 2007), 559 F. Supp. 2d 1036, 1043, citing *Boyd v. Bechtel Corp., supra*, 485
14   F.Supp. 610, 622.)

15    Class Counsel, having prosecuted numerous cases based on defective
16   products, and numerous class actions, including on behalf of consumers, are
17   experienced and qualified to evaluate the Class claims and to evaluate the risks and
18   potential outcome of further litigation and the propriety of settlement on a fully
19   informed basis. Khoury Decl. ¶70.

20    Counsel on both sides share the view this is a fair and reasonable settlement in
21   light of the complexities of the case, the state of the law, and of the uncertainties of
22   the outcome of litigation. The opinion of counsel in support of the proposed
23   Settlement is based on a realistic assessment of the strengths and weaknesses of their
24   respective cases, extensive legal and factual research, the substantial discovery
25   detailed above, as well as the extensive law and motion resulting in many dispositive
26   rulings by the Court. The opinion of counsel is also based on an assessment of the
27   risks of proceeding with the litigation through trial and, if a verdict were recovered,
28   through appeal as compared to the value of a settlement at this time. Given the risks

- 19 -

1   inherent in litigation and the defenses asserted, this Settlement is fair, adequate, and

2   reasonable and in the best interests of the class, and should be preliminarily

3   approved. Khoury Decl. ¶71.

4       **D.    The Proposed Settlement is a Reasonable Compromise of Claims.**

5       Plaintiffs' Counsel believes the proposed Settlement is in the best interest of

6   the Class based on detailed knowledge of the factual and legal issues present in this

7   action. Counsel considered, among other issues, the risks of trial and other normal

8   perils of litigation that affect the value of the claims in reaching the proposed

9   Settlement. See discussion, Section VIII., *supra.*

10      Class Counsel relied upon the extensive information and documentation

11  produced through investigation, exchange of documents pursuant to the initial

12  disclosure statements, formal discovery, 30(b)(6) depositions, extensive work by

13  consultants and designated experts, and information obtained from Class Members,

14  to assess the exposure to Conair from claims based on the contention the Hair Dryers

15  were defectively designed. Khoury Decl. ¶58.

16      Conair reports a total of 551,574 potential purchasers in the United States of

17  Dryers made by Neumax, after retailer returns and a recall. Khoury Decl. ¶59.

18      Conair reports from inception through July 2013 (when the alleged defective

19  cord design was changed), there were 1,922,865 Sun Luen Hair Dryers sold in the

20  United States. Based on Conair documents, extrapolated to the time of trial, there

21  were 380,777 Silver Plan Hair Dryers sold in the United States during the Class

22  Period. Khoury Decl. ¶60.

23      Conair does not sell Hair Dryers directly to consumers; it sells directly to over

24  200 retailers. Because no precise measure of state specific sales is readily available,

25  sales for New York and California were estimated by the Parties' experts. In the

26  opinion of Plaintiffs' economist Mark Falkenhagen, 9.87% and 7.03% of sales were

27  made in California and New York, respectively. Conair's damages expert, Henry

28  Kahrs, contends, if a percentage of sales could be adequately established, 8.63% and

- 20 -

Points & Authorities ISO Plaintiffs' Motion for an Order Granting Preliminary Approval of Class Action Settlement - Case No. 13CV01901 BEN (RBB)

7.99%, respectively, are more accurate sales estimates. Falkenhagen found the Hair Dryers had an average price of $35.10, while Kahrs found, if an average retail price could be determined, a price of $29.12 would be more accurate. Khoury Decl. ¶61.

Plaintiffs' economist prepared several alternative damage models. The most aggressive model was for "full restitution" based on a weighted average retail price of $35.10 per every Hair Dryer sold in California and New York, at any time during the class period, whether it had failed or not. Also calculated was a "partial refund" of $23.98, based on subtracting Conair's $11.12 weighted average cost to obtain the Dryers from the retail price; and several "benefit of the bargain" models, including the "replacement value" of the Dryer as of the time of trial, which discounts the value based on the use of the Dryer consumers have already enjoyed. Totals without interest were:

| | | |
|---|---|---|
| Full Refund | - $20,111,717 | [w/ GBL $50 statutory damages[2]] |
| Full Refund | - $17,092,366 | [w/o GBL $50 statutory damages] |
| Partial Refund | - $11,677,349 | [retail price after manufacturer cost] |
| Replacement | - $5,415,018 | [replacement value at time of trial] |

Khoury Decl. ¶62.

Applying the opinions as to the number of Neumax Hair Dryers sold in California and New York, at the average retail price of the Dryers determined by Plaintiffs' and Defendants' experts, shows a range of value from $2,669,489 to $3,423,724. Khoury Decl. ¶63.

Applying the opinions of Plaintiffs' and Defendants' experts as to the number of Sun Luen and Silver Plan Hair Dryers sold in California and New York, at $5 per Hair Dryer, shows a range of value from $1,914,327 to $1,946,577. Khoury Decl. ¶64.

Applying the rational discounts described above to the claims alleged

---

[2]Under New York's General Business Law, actual damages or $50 per incident may be claimed, but is not required to be awarded.

produced the values in the Settlement Agreement, with benefits being made available to the class of $4,583,816 to $5,370,301. Khoury Decl. ¶65.

A settlement is not judged solely against what might have been recovered had plaintiff prevailed at trial, nor must the settlement provide 100% of the damages sought to be fair and reasonable. *Linney v. Cellular Alaska Partnership*, 151 F. 3d 1234, 1242 (9th Cir. 1998); *In re Mego Fin. Corp. Sec. Litig.*, 213 F. 3d 454, 459 (9th Cir. 2000). The adequacy of the amount recovered must be judged as "a yielding of absolutes. . . Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation . . ." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th  Cir. 1982) (citation omitted). "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not . . . render the settlement inadequate or unfair." *Officers for Justice v. Civil Serv. Comm'n* 688 F.2d at 628.  Accordingly, the proposed Settlement is not to be judged against a speculative measure of what might have been achieved.  *Linney v. Cellular Alaska Partnership, supra.*

The $5.37 million benefit made available to the Class compares favorably with the potential damages available at trial. For example, the amount made available in the Settlement is about the same as Plaintiffs' "replacement value" damage model. Khoury Decl. ¶66. If Plaintiffs overcame the considerable risk of not establishing liability, and the risk of not adequately establishing class-wide damages, it is reasonable to believe a jury *may* have awarded damages in this range based on, among other things, Conair's argument, supported by expert testimony, that the vast majority of Class Members experienced no problem and derived considerable, even full, value from their purchase of the Hair Dryers. Khoury Decl. ¶67.

Based on the facts in the record and the Parties' arguments at the final fairness hearing, the Court finds that the settlement is within the range of reasonableness in light of the risks and costs of litigation. See *Stovall-Gusman v. Granger, Inc.*, No.

13-cv-02540-HSG, 2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015) (granting final approval of a net settlement amount representing 7.3% of the plaintiffs' potential recovery at trial).

## IX.   CLASS COUNSELS' ATTORNEYS' FEES REQUEST AND CLASS REPRESENTATIVE SERVICE PAYMENT

### A.   Motion for Award of Attorneys' Fees and Litigation Costs.

Class Counsels' attorneys' fees and litigation costs incurred pursuing this action will be paid directly by Conair, not from any amount made available to the Class. Class Counsel will file a motion requesting reimbursement of their litigation expenses of up to $231,000 and an award of fees not to exceed $1,196,000. The motion for attorneys' fees and costs will detail the hours expended and the litigation expenses advanced. Khoury Decl. ¶72.

### B.   Class Representative Service Payments.

Class representatives "are eligible for reasonable incentive payments. The district court must evaluate their awards individually, using 'relevant factors including the actions the plaintiff has taken to protect the interests of the class, the degree to which the class had benefitted from those actions, the amount of time and effort the plaintiff in pursuing the litigation.'" *Staton v. Boeing Corp.,* 327 F.3d 938, 977 (9th Cir. 2003) [citations and internal alterations omitted].

Subject to the Court's approval at the time of the final fairness hearing, Class Counsel will request on behalf of Plaintiffs, the sum of $10,000 each for their time, effort, and risks undertaken for the payment of costs in the event this action had been unsuccessful. The requested service payments are fair and reasonable because Plaintiffs were instrumental in achieving the settlement in this case. Plaintiffs invested a great deal of personal time and effort into the investigation, prosecution, and the settlement of the case, as will be set forth in their declarations to be filed in conjunction with the motion for final approval of class action settlement. Khoury Decl. ¶73. See, e.g., *Singer v. Becton Dickinson & Co.,* 2010 U.S. Dist. LEXIS

- 23 -

Points & Authorities ISO Plaintiffs' Motion for an Order Granting Preliminary Approval of Class Action Settlement - Case No. 13CV01901 BEN (RBB)

53416 at \*24-26 (S.D. Cal. June 1, 2010) ("The $25,000 incentive award is ... well within the acceptable range awarded in similar cases."]; discussing, *Brotherton v. Cleveland*, 141 F. supp. 2d 907, 913-14 (S.D. Ohio 2001) [approving $50,000 class representative payment to named plaintiff]; and *Van Vranken v. Atlantic Richfield Co*., 901 F. Supp. 294, 299 (N.D. Cal. 1995) (same); *Glass v. UBS Financial Services*, 2007 U.S. Dist. LEXIS 8476, 50-52 (N.D. Cal. Jan. 26, 2007) (per Chesney, J.; approving $25,000 class representative payment].

## X.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court preliminarily approve the proposed Settlement, affirm certification pursuant to FRCP Rule 23 for settlement purposes, appoint Plaintiffs Cynthia Czuchaj and Patricia Carter as the Class Representatives, affirm Plaintiffs' attorneys as Class Counsel, approve the form of the Notice and order it be provided to the Class, appoint KCC as the Settlement administrator, and set a final approval hearing date.

Dated: November 4, 2016          ODENBREIT LAW, APC
                                 COHELAN KHOURY & SINGER
                                 BISNAR|CHASE LLP

                                 By: /s/ Jeff Geraci
                                     Jeff Geraci
                                 Attorneys for Plaintiffs